USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/16/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                   :

UNITED STATES OF AMERICA                :

                                              :

                   -against-                 :           21-CR-603 (VEC)

                                              :

                                            :          <u>OPINION AND ORDER</u>

WILLIAM BYNUM,                        :

                                    Defendant.      :

                                            :
------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

       After a two-week jury trial, Defendant William Bynum was acquitted of conspiracy to

commit health care fraud and wire fraud in violation of 18 U.S.C. §§ 1343, 1347, 1349 (Count

One), and convicted of conspiracy to make false statements relating to health care matters in

violation of 18 U.S.C. §§ 371, 1035 (Count Two). *See* Verdict Sheet, Dkt. 1158; Superseding

Indictment ("S9"), Dkt. 927.[1] Mr. Bynum moved for acquittal on Count Two pursuant to Rule

29 of the Federal Rules of Criminal Procedure or a new trial pursuant to Rule 33 of the Federal

Rules of Criminal Procedure on the grounds that the Court's conscious avoidance jury

instructions were erroneous. *See* Def. Mem., Dkt. 1182. For the following reasons, Mr.

Bynum's motion is DENIED.

## BACKGROUND

       The National Basketball Association ("NBA") offers a Health and Welfare Benefit Plan

(the "Plan") that is funded by the NBA for the benefit of basketball players who have played for

teams in the league and their families. *See* Tr. 207:2-16, 345:19–346:12; DX 43 at 11. Mr.

---

[1]      Mr. Bynum was tried with one of his co-conspirators, Ronald Glen Davis. This Opinion refers to Mr. Bynum and Mr. Davis together as "Defendants." Any references to "Tr." are to the trial transcript. *See* Dkts. 1160, 1162, 1164, 1166, 1168, 1170, 1172, 1174, 1176.

Bynum is a former NBA player and Plan participant.  *See* Tr. 1466:25–1467:8, 1476:25–1477:4,

1479:22–1480:12, 1516:21–1517:12; DX 35.  The Plan provides each participant with a health

reimbursement account ("HRA").  *See* Tr. 359:4-13, 1884:7-12, 1886:7-15.  The Plan is

available to reimburse participants, their spouses, and their dependents for otherwise

unreimbursed health care costs.  *See id.* 207:2-16, 1887:8-10.  Reimbursements from the Plan for

health care expenses are not taxable income to Plan participants.  *See id.* 208:25–209:15.

From about 2017 to 2021, Mr. Bynum and other former NBA players submitted false

invoices seeking reimbursement for health care expenses that were never actually incurred.  *See*

*id.* 46:20–47:3, 435:14–436:6, 445:14–447:8, 449:6-10; S9 ¶ 1.

Former NBA player Terrence Williams contacted Mr. Bynum in 2018.  *See* Tr. 1514:4–

1516:20.  Mr. Williams asked Mr. Bynum where he had received medical services and offered to

provide invoices so that Mr. Bynum could obtain Plan funds.  *See id.* 1518:8-24.  Mr. Bynum

testified that he thought Mr. Williams was helping him legitimately access Plan funds because

Mr. Williams had been an NBA player and because Mr. Bynum believed Mr. Williams was

working for the NBA Players' Association (the "Players' Association").[2]  *See id.* 206:4-5,

1518:18–1519:3.  In July 2018, Mr. Bynum learned from the Plan's administrator, United

Medical Resources ("UMR"), that he had a balance of approximately $275,000 in his HRA

account.  *See* GX 401; GX 401T.[3]

Around the time of their first contact on this issue, Mr. Williams texted Mr. Bynum,

"You gonna have to pay tax [and] Fee but [I] can get you A LOT[.]"  GX 1000-A; *see also* Tr.

---

[2]      Mr. Bynum testified that he thought Mr. Williams worked for both the NBA and the Players' Association.
*See* Tr. 1750:5–1751:7.  Aside from Mr. Bynum's testimony, there was no evidence that Mr. Williams falsely
represented himself to be working for either the NBA or the Players' Association.

[3]      The transcript of Mr. Bynum's call to UMR states that the call took place on November 12, 2018.  *See* GX
401T.  UMR's call records, however, reflect that the call took place on July 6, 2018.  *See* GX 400; Tr. 563:9–
565:21, 1609:9–1611:13.

1562:12-18.  He also indicated that Mr. Bynum would need to pay him around $40,000; Mr.

Bynum responded, "Let's get it[.]"  GX 1000-A; *see also* Tr. 1562:22–1563:24, 1564:23–

1565:11.  Mr. Bynum testified that Mr. Williams's request for a tax payment made him believe

that the transaction was legitimate.  *See* Tr. 1566:20-22.[4]

That same day, in an email with the subject line "2018 200k William Bynum," Mr.

Williams sent Mr. Bynum twenty pages of fake invoices for services Mr. Bynum purportedly

received at the Advanced Chiropractic & Rehab Center (the "Rehab Center") in California.[5]  *See*

GX 602.  Mr. Bynum never received those services; he was based in Illinois at the time they

were supposedly provided.  *See* Tr. 1519:19–1520:14, 1813:10-21; GX 602.[6]  Although Mr.

Bynum testified that he received services from the Rehab Center "hundreds of times" over the

years and that he paid for those services in cash, *see* Tr. 1577:10-14, 1506:3-9, the Rehab Center

did not have any patient records for Mr. Bynum, *see id.* 740:4-16, 1768:6-19.[7]

Two weeks after receiving the fake invoices from Mr. Williams, Mr. Bynum used the

invoices to submit a claim (the "Claim") for $200,000 to UMR.  *See* Tr. 550:21–551:8, 557:21–

558:13; GX 408.  The Claim form contained Mr. Bynum's electronic signature and identifying

---

[4]    Mr. Bynum acknowledged on cross-examination that he did not pay income taxes in 2018 or 2019 and that he could not recall if he paid income taxes in 2017.  *See* Tr. 1792:6–1794:19.

[5]    Mr. Bynum referred to the Rehab Center as "Sports Rehab" at trial.  *See* Tr. 1812:7-15.

[6]    The purported services spanned from 2016 to 2018, and the fake invoices were sent from Mr. Williams's personal email account, almostime@gmail.com.  *See* GX 602.  Mr. Bynum testified that he only "glanced at" the fake invoices and that it did not occur to him that they could be fake.  Tr. 1522:14–1523:8.  He did not ask Mr. Williams how he obtained Mr. Bynum's medical records or why he was using a Gmail address rather than an official Players' Association email address.  *See* Tr. 1762:16–1764:9.  By contrast, when Mr. Bynum submitted a legitimate claim for dental expenses in 2019, he asked his doctor's office for receipts and did not pay any taxes or fees.  *See id.* 1803:6–1807:23.

[7]    Mr. Bynum testified that he was never required to complete paperwork when he received services at the Rehab Center.  *See* Tr. 1506:24–1507:8, 1770:8-18.  The Rehab Center's primary doctor was Patrick Khaziran; Mr. Bynum admitted on cross-examination that he did not know Dr. Khaziran.  *See id.* 730:5-12, 1775:7-10.

information, the dates of purported services, the service provider, and the total requested

reimbursement amount.  *See* GX 408; Tr. 1637:15–1638:10.[8]

    Mr. Bynum called UMR before and after submitting the Claim form to ensure that it was

properly completed and to inquire about the Claim's progress throughout the payment process.

*See* Tr. 561:23–562:21; GX 419; GX 400.[9]  Mr. Bynum eventually told Mr. Williams that the

Claim had been submitted and verified; he also told Mr. Williams that he would keep him

updated.  *See* GX 1001-A; Tr. 1567:14–1569:13.  Mr. Williams later told Mr. Bynum that he was

on the phone with the NBA and that Mr. Bynum would receive $182,224 in his account by the

following day.  *See* GX 1001-C; Tr. 1574:4-12.  Mr. Bynum received payment from UMR on

December 10, 2018, *see* GX 1551 at 241; Tr. 1648:16–1649:3, and Mr. Bynum paid Mr.

Williams $30,000[10] two days later, *see* GX 1551 at 241; Tr. 1616:5-7; 1649:4-12.

    In 2021, Mr. Bynum was charged with conspiracy to commit health care fraud and wire

fraud in violation of 18 U.S.C. §§ 1343, 1347, 1349 (Count One).  *See* Indictment, Dkt. 2.  In

2022, Mr. Bynum was charged with a separate conspiracy to make false statements relating to

---

[8]    Mr. Bynum testified that he could not remember whether he filled out the Claim form himself because he was not very familiar with the claim-filing process, the Plan, or Adobe software at the time he submitted the Claim. *See* Tr. 1578:18–1580:5, 1608:13–1609:8.  Mr. Bynum acknowledged, however, that he discussed what needed to be provided on the Claim form with a UMR representative; he also acknowledged that he emailed the completed form (which was completed and signed using Adobe software, and which included information from the fake invoices) to UMR, undercutting his testimony that he barely looked at the invoices and that he did not recall whether he filled out the Claim form.  *See* Tr. 1617:19–1621:4, 1637:7-9; GX 402; GX 402-T.  Mr. Bynum downloaded Adobe and took screenshots of the invoices shortly before submitting the Claim form.  *See* Tr. 1629:4–1630:7, 1642:11–24; GX 652-E; GX 652-F; GX 652-G.  He also took a screenshot of the Claim form before it was filled out. *See* Tr. 1628:5-16; GX 654.

[9]    Mr. Bynum testified that he followed up on the Claim because Mr. Williams pestered him for updates and because he wanted to know when he would be paid.  *See* Tr. 1521:12-24, 1623:5–1624:9.  Mr. Bynum called UMR about the Claim without involving his financial advisor (who had joined him on his call to UMR in July 2018) or Mr. Williams.  *See* Tr. 1619:9-19, 1622:22–1623:4.  On one occasion, Mr. Williams impersonated Mr. Bynum on a call to UMR, apparently so that he could independently confirm the Claim's progress.  *See* Tr. 1061:22–1062:19; GX 411; GX 411T.

[10]    Mr. Bynum testified that Mr. Williams agreed to reduce the payment Mr. Bynum was required to pay Mr. Williams from $40,000 to $30,000.  *See* Tr. 1564:25–1565:11, 1789:5–1790:5.

health care matters in violation of 18 U.S.C. § 371, 1035 (Count Two).  *See* Superseding

Indictment, Dkt. 497.  He was tried with one of his co-conspirators, Ronald Glen Davis.

During the charge conference, Defendants objected to the jury being charged on

conscious avoidance.  *See* Tr. 1706:4–1710:2, 1718:11–1720:18.  The Court overruled the

objection but edited the draft charge to make clear that, although the jury could consider whether

a Defendant consciously avoided knowing the goal of the charged conspiracies, the jury could

not use a conscious avoidance theory to decide that the Defendant had knowingly joined either of

the charged conspiracies.  *Id.*[11]

On November 15, 2023, the jury acquitted Mr. Bynum on Count One and convicted Mr.

Bynum on Count Two.  *See* Verdict Sheet; Tr. 2186:16-19, 2187:6-9.

## DISCUSSION

### I.   Legal Standard

Federal Rule of Criminal Procedure 29(a) provides that a court must "enter a judgment of

acquittal of any offense for which the evidence is insufficient to sustain a conviction."  "'[T]he

relevant question is whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt.'"  *United States v. Taylor*, 475 F. App'x 780, 781 (2d Cir. 2012)

(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  "'[A] judgment of acquittal' is

warranted 'only if the evidence that the defendant committed the crime alleged is nonexistent or

so meager that no reasonable jury could find guilt beyond a reasonable doubt.'"  *United States v.*

---

[11]     After the Government rested, and again after Defendants rested, Mr. Bynum moved for acquittal pursuant
to Federal Rule of Criminal Procedure 29.  *See* Tr. 1457:6-11, 1857:3-8.  The Court denied both motions.  *See* Tr.
1460:14-21, 1857:9-10.

*Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)).

"A court examines each piece of evidence and considers its probative value before determining whether it is unreasonable to find 'the evidence in its totality, not in isolation,' sufficient to support guilt beyond a reasonable doubt." *United States v. Goffer*, 721 F.3d 113, 124 (2d Cir. 2013) (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)).   Courts "'resolve all inferences from the evidence and issues of credibility in favor of the verdict.'" *United States v. Zayac*, 765 F.3d 112, 117 (2d Cir. 2014) (quoting *United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000)).   "'[T]he jury's verdict may be based entirely on circumstantial evidence.'" *Goffer*, 721 F.3d at 124 (quoting *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008)).

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a); *see also United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013).   "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).   "To grant the motion, 'there must be a real concern that an innocent person may have been convicted.'" *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *Ferguson*, 246 F.3d at 134).   An erroneous jury instruction warrants a new trial if it was not harmless. *See United States v. Sheehan*, 838 F.3d 109, 121 (2d Cir. 2016).

## II.   The Jury Instructions Were Not Erroneous

Mr. Bynum argues that the jury instructions were erroneous because they misled the jury into believing that it could convict Mr. Bynum on a conscious avoidance theory of joining a

6

conspiracy he did not know existed.  *See* Def. Mem. at 1.  Even if the jury instructions were not

misleading, Mr. Bynum asserts, a conscious avoidance instruction was erroneous because no

rational factfinder could have concluded that he consciously avoided knowing that the

conspiracy he joined had unlawful aims.  *See id.*  Mr. Bynum's arguments are unavailing.

### A.  The Jury Instructions Were Not Misleading

#### 1.  Legal Standard

"There are 'two aspects of knowledge in a conspiracy: [(1)] knowing participation or

membership in the scheme charged and [(2)] some knowledge of the unlawful aims and

objectives of the scheme.'"  *United States v. Ferrarini*, 219 F.3d 145, 154–55 (2d Cir. 2000)

(quoting *United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir. 1986)).  Although conscious

avoidance "may not be used to support a finding as to the former," it "may be used to support a

finding with respect to the latter, i.e., knowledge of the conspiracy's unlawful goals."  *Id.*

(citations omitted).

When determining whether a jury charge was proper, courts consider the charge "as a

whole."  *United States v. Svoboda*, 347 F.3d 471, 482 (2d Cir. 2003); *see also Cupp v. Naughten*,

414 U.S. 141, 146–47 (1973) (noting the "well established proposition" that a jury instruction

"must be viewed in the context of the overall charge").

#### 2.  Application

Mr. Bynum primarily argues that the jury instructions for Count Two were misleading

because they did not specify that the jury could not find that Mr. Bynum knowingly joined the

conspiracy on a conscious avoidance theory.  *See* Def. Mem. at 1, 7–9.  Mr. Bynum's argument

assumes, however, that the jury instructions for Count Two were read in isolation.  That is not

the law.  *See Ferrarini*, 219 F.3d at 155–56 (concluding that a jury could not have found that the

defendant intended to participate in the conspiracy based on conscious avoidance because the charge "as a whole" was proper; the instructions "explicitly" provided when a conscious avoidance theory was available); *Svoboda*, 347 F.3d at 481–82 (concluding that a conscious avoidance jury charge was not erroneous in part because the jury instructions, "as a whole, repeatedly and emphatically instructed the jury" as to the conspiracy charge's *mens rea* requirement).

The Court first instructed the jury on two substantive charges that were pending against Mr. Bynum's co-defendant — wire fraud and health care fraud — and then instructed the jury on the two conspiracy charges that were pending against both Defendants — conspiracy to commit wire fraud and healthcare fraud (Count One) and conspiracy to make false statements related to healthcare matters (Count Two).  *See* Tr. 2143–2182; Jury Charge, Dkt. 1151.  Read in context, the instructions for Count Two were not misleading.

Beginning with the substantive charges, the Court instructed the jury that, to act "knowingly" and "intentionally," a person must act "voluntarily and deliberately, rather than mistakenly or inadvertently," and that a person's actions "must have been his conscious objective rather than the product of mistake, accident, negligen[ce], or some other innocent reason."  Tr. 2160:19-24.  Finding that a defendant acted "with a conscious purpose to avoid learning the truth about the fraudulent nature of [a] scheme," or that a defendant was "aware of a high probability that the scheme was fraudulent and that the [d]efendant acted with deliberate disregard of that high probability," the Court instructed, was enough to find that the defendant acted "knowingly." *Id.* 2161:24–2162:7.

With respect to Count One — the conspiracy to commit wire and health care fraud — the Court directed the jury to apply the same instructions when deciding whether a Defendant

"knowingly" and "willfully" joined the conspiracy, the goal of which was to commit wire fraud and healthcare fraud. *Id.* 2170:22-24. The Court explained that "[t]here are two parts" to the existence of a conspiracy: "an agreement and an illegal goal." *Id.* 2169:14-16. "As with [the] substantive offenses of wire fraud and health care fraud," if the jury found that a Defendant "deliberately and consciously avoid[ed] learning the illegal goal of the conspiracy," then it could find that the Defendant acted knowingly. *Id.* 2171:11-15. Although the jury could consider conscious avoidance in deciding whether a Defendant knew the goal or goals of the conspiracy, the Court explained, it could not do so "in deciding whether the defendant knowingly and willfully joined the conspiracy." *Id.* 2171:21-25.

The jury instructions for Count Two provided, in relevant part, that the Government had to prove that the Defendant "knowingly and intentionally became a member of the conspiracy," and directed the jury to apply the Court's previous instructions regarding the definitions of "knowing" and "intentionally." *Id.* 2174:6-10. The Court repeated its charge from Count One that, to establish the existence of a conspiracy, the Government needed to prove "an agreement and an illegal goal." *Id.* 2173:10-13. "As was with the case of [Count One]," the Court instructed, the jury could find that a Defendant acted knowingly if he "deliberately and consciously avoided learning the illegal goal of the conspiracy." *Id.* 2174:11-16.

Read as a whole, the jury instructions expressly provided that Mr. Bynum must have joined the conspiracy "voluntarily and deliberately" rather than innocently or accidentally to be found guilty. But after finding that the Defendant had knowingly and intentionally joined the conspiracy, the jury could use a conscious avoidance theory to find that the Defendant knew the illegal goal of the conspiracy. *See United States v. Khalupsky*, 5 F.4th 279, 297 (2d Cir. 2021) (concluding that the jury could not have convicted the defendants "by finding only conscious

avoidance of the fact of participation in the conspiracy" because the jury instructions "made clear that proof of membership in the conspiracy required a showing of actual knowledge"); *United States v. Lange*, 834 F.3d 58, 76–77 (2d Cir. 2016) (same even though the Court overruled Defense counsel's requested instruction "that conscious avoidance may never be used as a substitute for knowing participation in a conspiracy" because the instructions "clearly provided that the Government had to prove that the defendants intentionally engaged in the conspiracy"). The Court's instruction that there are "two parts" to the existence of a conspiracy — an agreement and an illegal goal — facilitated the jury's application of two different knowledge theories. *See Ferrarini*, 219 F.3d at 155–56 (affirming a conscious avoidance conspiracy jury charge instructing the jury to "determine not only whether [the defendant] participated in [the conspiracy], but whether he did so with knowledge of its unlawful purposes").[12]

For all of those reasons, the jury instructions were legally correct and were not misleading.

---

[12]     Mr. Bynum maintains that the Court erred by refusing to charge that "it is logically impossible to intend and agree to join a conspiracy if a defendant does not know of its existence." Def. Mem., Dkt. 1182, at 7. That language was unnecessary and irrelevant to conscious avoidance; the charge already explained that Mr. Bynum had to have knowingly and intentionally joined the conspiracy to be found guilty. *See* Tr. 2174:6–10; *see also* Tr. 1720:3-18 (overruling Mr. Bynum's objection); *cf. United States v. Espino*, No. 21-1412, 2022 WL 4112679, at *3 (2d Cir. Sept. 9, 2022) (concluding that the district court "was not required to give [the defendant's] formulation of [a conspiracy instruction] in addition to the perfectly adequate one that it gave").

Mr. Bynum also takes issue with the inclusion of "three *different* conscious avoidance instructions." Def. Mem. at 7. Repeating and adjusting the conscious avoidance instructions was inevitable; conscious avoidance was applicable to different aspects of the charge under different circumstances. The Court's decision to fashion its own conscious avoidance instructions instead of adopting the Government's proposed language, *see id.*, is irrelevant.

Finally, Mr. Bynum attempts to cast doubt on the jury's ability correctly to apply the instructions by asserting that Mr. Bynum's acquittal on Count One is inconsistent with his conviction on Count Two. *See id.* at 8; Def. Reply Mem., Dkt. 1245, at 1. Mr. Bynum ignores, however, that Count One charged a conspiracy to commit wire fraud and health care fraud, while Count Two charged a conspiracy to make false statements relating to health care matters — distinct offenses with distinct elements and factual records. The jury's verdict is not fatally inconsistent and Mr. Bynum was not "acquit[ted] and convict[ed] . . . of participating in the same conspiracy." Def. Reply Mem. at 3.

### B.  The Conscious Avoidance Charge Was Warranted

#### 1.  Legal Standard

A conscious avoidance instruction is warranted if (1) the defendant asserts "'the lack of some specific aspect of knowledge required for conviction'" and (2) if the evidence would allow a rational juror to conclude that the defendant "'was aware of a high probability of the criminal objective and consciously avoided confirming the fact.'"  *United States v. Lewis*, 545 F. App'x 9, 11 (2d Cir. 2013) (cleaned up and quoting *Ferrarini*, 219 F.3d at 154).  "'Red flags' about the legitimacy of a transaction 'can be used to show both actual knowledge and conscious avoidance.'"  *Id.* at 12 (quoting *Ferguson*, 676 F.3d at 278).

#### 2.  Application

Mr. Bynum conceded at the outset of trial that he received fake invoices from Mr. Williams, submitted those invoices to the Plan for reimbursement, was reimbursed, and paid Mr. Williams a portion of his ill-gotten gains.  *See* Tr. 46:20–47:3.  Email, text, phone, and bank records, as well as Mr. Bynum's own testimony, confirmed that those things happened.  *See supra*, Background.  The key issues at trial were whether Mr. Bynum knowingly joined either or both of the charged conspiracies and whether he knew or suspected that his Claim was based on fake invoices.  *See* Tr. 47:3-5.  Mr. Bynum repeatedly testified that, despite the myriad suspicious circumstances surrounding the Claim and his communications with Mr. Williams, he never suspected any unlawful conduct or false statements.  *See, e.g.*, Tr. 1516:2-7, 1518:2-7, 1522:14–1523:8.  Mr. Bynum, therefore, asserted a "lack of some specific aspect of knowledge required for conviction," *Lewis*, 545 F. App'x at 11, satisfying the first condition that warrants giving a conscious avoidance instruction, *see United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003) (concluding that a conscious avoidance charge "is appropriate in all but the highly

unusual—perhaps non-existent—case" if a defendant testifies that he lacked the requisite knowledge for conviction).

Ample evidence emerged at trial for a juror to discredit Mr. Bynum's testimony and to find that he either knew or consciously avoided knowing that his Claim contained false information.  Instead of obtaining invoices from the Rehab Center, Mr. Bynum obtained invoices from Mr. Williams, a former NBA player who used his personal email address for supposedly official NBA business, and who provided invoices that totaled exactly $200,000.  The fake invoices listed services that Mr. Bynum never received, and the services were purportedly provided by the Rehab Center, which has no record of treating Mr. Bynum.  The Rehab Center is based in California, and the purported services were provided during a period when Mr. Bynum was residing in Illinois.  Mr. Williams required Mr. Bynum to pay him a fee and purported taxes even though Plan reimbursements were not taxable and there was no explanation why taxes would be paid to Mr. Williams rather than to the taxing authorities.  Mr. Williams pestered Mr. Bynum about the Claim even after he had purportedly eliminated his "fee" but there is no explanation why Mr. Williams would be so interested in a claim in which he had no financial interest.  Mr. Bynum never discussed the Claim with his financial advisor and did not ask Mr. Williams any follow-up questions about this parade of red flags.  That was more than sufficient for a reasonable juror to conclude that Mr. Bynum either knew or consciously avoided knowing that the Claim included false statements.[13]  *See Khalupsky*, 5. F.4th at 297 (concluding that there

---

[13]     Mr. Bynum's arguments to the contrary, which do not cite to the record, merely rehash points that were presented to and rejected by the jury.  *See* Def. Mem. at 3–5; Def. Reply Mem. at 3.  The Court briefly addresses his main arguments.

         First, Mr. Bynum contends that there was no factual predicate for conscious avoidance because when he questioned Mr. Williams about why Mr. Williams would be entitled to a fee for his services, Mr. Williams withdrew the fee, and Mr. Bynum believed that the $30,000 was a tax payment.  *See* Def. Mem. at 3–4.  Despite that testimony, the undisputed bank records show that Mr. Bynum paid Mr. Williams $30,000, and a reasonable juror could have discredited Mr. Bynum's assertion that he believed he was giving Mr. Williams $30,000 to cover the

was a factual predicate for a conscious avoidance instruction because the defendant "chose not to confirm" the "reasonable" suspicion that documents had been illicitly obtained); *Lewis*, 545 F. App'x at 12 (same because the defendant "never read" the fraudulent papers she filed even though she had "reason to question" their veracity); *Svoboda*, 347 F.3d at 480–81 (same because the defendant's source of financial trading information, the timing of trades, and trade returns, were "suspicious").[14]

---

doctors' fees and taxes, particularly given Mr. Williams's overbearing interest in whether Mr. Bynum had submitted the Claim and where the Claim was in the payment process. Mr. Bynum also claims that the transaction seemed legitimate because Mr. Williams purported to represent the Players Association. *See id.* at 4. A reasonable juror could have readily discredited Mr. Bynum's testimony, however, given that Mr. Williams used a personal email address to communicate with Mr. Bynum about the Claim.

Mr. Bynum also asserts that Mr. Williams's decision to impersonate him on a phone call to UMR shows that Mr. Bynum was not part of a conspiracy. *See id.* Mr. Bynum and Mr. Williams both called UMR for the same reason: to ascertain the timeline for payment of the Claim. The mere fact that Mr. Williams impersonated Mr. Bynum (apparently) to confirm that Mr. Bynum had accurately relayed the Claim's progress does not preclude them from being conspirators. To the contrary, it brings to mind the adage: There is no honor among thieves.

Mr. Bynum argues that he was led to believe that the invoices were authentic because he, in fact, received services from the Rehab Center in California. *See id.* at 4–5. The Rehab Center had no record of treating Mr. Bynum, however, and Mr. Bynum was based in Illinois when he supposedly was receiving regular services in California. Mr. Bynum did not even recognize the name of the Rehab Center's primary doctor, co-conspirator Patrick Khaziran. Viewed in the light most favorable to the Government, this evidence could have easily led a reasonable juror to decide that Mr. Bynum's testimony was not credible.

Mr. Bynum also contends that there was no factual predicate for conscious avoidance because nobody testified that he played a role in the conspiracy. *See id.* at 5; Def. Reply Mem. at 3. For the reasons discussed *supra*, however, there were plenty of other red flags justifying the charge.

Mr. Bynum further points out that he included his financial advisor on one of his calls to UMR. *See id.*; Tr. 1609:9–1610:15; GX 400; GX 401; GX 401T. That phone call predated the fake invoices and the Claim. If anything, Mr. Bynum's decision to include his financial advisor on an innocuous call with UMR but not on any of the calls regarding the Claim could have led a reasonable juror to conclude that part of his conscious avoidance was hiding the Claim from, or at least not disclosing it to, his financial advisor.

Finally, Mr. Bynum asserts that the Government's opposition memorandum (not the jury charge) suggests that he was held to a negligence standard. *See* Reply Mem. at 2. Putting aside the fact that the Government's memorandum correctly articulates the law, Mr. Bynum's argument is irrelevant. The jury charge expressly stated that a person does not act "intentionally" if his actions were the product of negligence. *See* Tr. 2160:19-24; Jury Charge, Dkt. 1151, at 17:21-23.

[14]     Mr. Bynum's attempts to distinguish this case from *United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003), fall flat. He argues that, unlike in *Svoboda*, the Claim was cloaked in legitimacy because Mr. Williams appeared to represent the Players Association, charged taxes, and provided invoices from a facility Mr. Bynum frequented. As explained *supra* note 13, however, a reasonable juror could have easily concluded that Mr. Bynum's purported ignorance of red flags was not credible.

13

Mr. Bynum asserts that this case resembles *United States v. Mankani*, 738 F.2d 538 (2d Cir. 1984), in which the Second Circuit concluded that the evidence was insufficient to sustain a narcotics conspiracy conviction.  *See* Def. Mem. at 6; Def. Reply Mem., Dkt. 1245, at 1–2.  In that case, however, the Government argued that the defendant consciously avoided *participating* in the conspiracy, not that he consciously avoided knowing its illegal objective.  *Id.* at 547; *see also United States v. Scotti*, 47 F.3d 1237, 1242–43 (2d Cir. 1995) (explaining that *Mankani* held that a conscious avoidance instruction is inappropriate "on the fact issue of knowing participation in a conspiracy" and did not preclude the charge with respect to knowledge of the conspiracy's object).

For all of these reasons, the conscious avoidance charge was warranted.

## CONCLUSION

For the foregoing reasons, Mr. Bynum's motion for acquittal or a new trial is DENIED. Mr. Bynum's sentencing date remains **Tuesday, March 12, 2024, at 2:30 P.M.**  Pre-sentencing submissions remain due on **Tuesday, February 27, 2024**.

The Clerk of Court is respectfully directed to close the open motion at Docket Entry 1182.

**SO ORDERED.**

**Date:  January 16, 2024**
**        New York, NY**

_____
            **VALERIE CAPRONI**
            **United States District Judge**

14